UNITED STATES v. CINCINNATI & M. V. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. December 3, 1904.)

No. 1,323.

1. BRIDGES—CONSTRUCTION OF STATUTE AUTHORIZING BUILDING OF RAILROAD BRIDGE—RIGHT TO RENEW PARTS.

A grant by a state to a railroad company of authority to build and maintain a bridge across a river for the use of its road, without restriction as to time, or the materials of which it should be constructed, authorizes the company to renew parts of the bridge from time to time for the purpose of maintaining it or better adapting it to the exigencies of business, without substantial change in its form, whether it be done with the same or some other suitable material.

2. SAME—"BRIDGE" DEFINED.

Defendant railroad company built a bridge for its road across the Muskingum river under authority given by the state of Ohio, which then exercised control over the river. Subsequently the state transferred its rights in the river to the United States, which accepted the same. By Act April 2, 1888, c. 53, 25 Stat. 74, Congress prescribed regulations to govern the building of bridges across the river between certain points; requiring any bridge thereafter erected to have at least one channel span of stated width and stated height above the water, and providing that any person or corporation having lawful authority "may hereafter erect bridges across said river for railroad or other uses upon compliance with the provisions and requirements of this act," but not otherwise. *Held*, that the word "bridge," as used in the act, comprehended not only the span or roadway, but also the abutments and piers upon

which it was supported, and that the replacing by defendant of the wooden superstructure of its bridge, which had become unsafe from decay and long use, by a new superstructure of iron, did not constitute the erection of a new bridge, so as to bring it within the provisions of the act.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

The following is the opinion of the Circuit Court (Thompson, District Judge):

The line of the railway of the defendant the Cincinnati & Muskingum Valley Railroad Company crosses the Muskingum river about seven miles below Dresden, Ohio. The bridge upon which it crosses the river, and over which its trains are run, was built in 1870, under authority granted to it by the Board of Public Works of the state of Ohio, and was a lawful structure. Afterwards, in 1886, the state of Ohio transferred to the United States its "rights in said river and its improvements" (see volume 83, Ohio Laws, p. 412), and on April 2, 1888, Congress passed "An act regulating the construction of bridges over the Muskingum river, Ohio" (25 Stat. 74, c. 53), which provides:

"That any person or corporation having lawful authority to erect a bridge or bridges across the Muskingum river, Ohio, between its mouth and Dresden, may hereafter erect bridges across said river for railroad or other uses, upon compliance with the provisions and requirements of this act, but no bridge shall be erected across said river which does not comply therewith.

"Sec. 2. That every bridge hereafter erected across the Muskingum river, Ohio, shall have its axis at right angles to the current at medium and high stages, and its piers shall be parallel to the current. No riprap or other outside protection for insufficient foundations will be permitted around the channel piers and all cofferdams, piling and other temporary works must be removed by the owners of the bridge before it is open to traffic.

"Sec. 3. That if the bridge be built as a continuous bridge, it shall have at least one channel span, the center of which shall be in the middle of the channel usually run in high stages by steamboats descending the river with barges or rafts in tow; said channel span to have a clear opening of two hundred and fifty feet, measured at the low water line, and the lowest part of the span to be forty feet above highest navigable water, as determined by a straight line connecting the tops of the lower lock gates at the head and foot of the pool in which the bridge is to be built. The other spans may have such grades as may be desired."

"Sec. 9. That the right to alter, amend, or repeal this act as to prevent or remove all material obstructions to the navigation of said river by the future construction of bridges is hereby expressly reserved."

This law relates to bridges to be constructed after its passage, and manifestly, in the use of the word "bridge," Congress intended to include not only the superstructure, but also the piers and abutments. As already shown, it provides that its piers shall be parallel to the current, and that no riprap or outside protection for insufficient foundations will be permitted around the channel piers, and that the channel span shall have a clear opening of two hundred and fifty feet, measured at the low-water line. This language could not have reference to a bridge, the construction of which did not include piers and abutments, but only the superstructure. Congress had in mind such a structure as Bouvier defines a bridge to be, namely: "A structure erected over a river, creek, stream, ditch, ravine or other place to facilitate the passage thereof; including by the term both arches and abutments." It is equally clear that Congress did not intend by this law to interfere with existing bridges. This appears from the language of the ninth section, where it is said "that the right to alter, amend, or repeal this act so as to prevent or remove all material obstructions to the navigation of said river by the future construction of bridges is hereby expressly reserved." There is no provision in the law for the removal of obstructions caused by bridges which were in existence at the time the law was passed.

It is complained in this case that the defendants are erecting a bridge across the Muskingum river in violation of the act of April 2, 1888, and other laws relating to the subject, and the complainant prays that they be perpetually enjoined from proceeding with the work of constructing said bridge. It is conceded that the work which the defendants are doing is the replacing of the present wooden superstructure of the bridge with an iron superstructure, and the question presented is whether the superstructure constitutes a bridge, within the meaning of the act of April 2, 1888. No action has ever been taken by the government to remove any obstruction to navigation caused by this bridge and its piers, probably because the river between the bridge and Dresden is not used, and, without the construction of dams and locks, cannot be used, for the purpose of navigation, other than by flatboats and other small craft; but, if the improvements necessary to navigation by larger craft should be made, it would then be necessary to remove the obstructions caused by the bridge, whether the superstructure should remain as it is, or be replaced by an iron one; and it is suggested that, in the event of the removal of the bridge after the iron superstructure is placed thereon, the compensation which the government would be required to make therefor would be increased to the extent of the added value of the iron superstructure. But that is a question which does not arise here. The superstructure cannot be regarded as the bridge, within the meaning of the act, and the changing of the superstructure will not be the erection of a bridge in violation of the act.

The bill, therefore, will be dismissed.

Sherman T. McPherson, U. S. Atty.

Lawrence Maxwell, Jr., William W. Ramsey, and Joseph S. Graydon, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. The United States seeks by this bill to obtain an injunction restraining the appellee the Cincinnati & Muskingum Valley Railroad Company from renewing the superstructure of its bridge over the Muskingum river. The locality of the bridge is six miles below Dresden, in Ohio. The river is navigable for small craft from Dresden to the place where it empties into the Ohio. It appears that the state of Ohio had and maintained control over the Muskingum river prior to 1886, and had constructed numerous improvements thereon, and had authorized the building of several bridges across it—among them, the bridge of this railroad company. In May of that year the state, by a joint resolution of its General Assembly, found in 83 Ohio Laws, p. 412, transferred all its rights, interests, and franchises in the Muskingum river, "subject to the paramount interests of navigation," to the United States. Congress assented to the transfer, and the United States assumed control of the river August 5, 1886 (24 Stat. 324, c. 929). On April 2, 1888, Congress passed an act (25 Stat. 74, c. 53) regulating the construction of bridges across the Muskingum river between its mouth and Dresden, and it is upon the provisions of the third section of this act that the present bill is founded. The original bridge of the railroad company was built 30 or more years ago, with piers and abutments of stone, and a wooden superstructure. The bridge was built in conformity with the authorization of the state, and was maintained in its form and materials of construction until 1903, when, the superstructure having become unsafe on account of age, decay, and wear, the railroad company resolved to replace it with one of iron. The government objects to this, not so much, as we

infer, because it is proposed to build the superstructure of iron, but because the railroad company cannot lawfully rebuild it at all without conforming its entire bridge, including its piers and abutments, to said section 3 of the said act of Congress of 1888, which reads as follows:

"That if the bridge be built as a continuous bridge, it shall have at least one channel span, the center of which shall be in the middle of the channel usually run in high stages by steamboats descending the river with barges or rafts in tow; said channel span to have a clear opening of two hundred and fifty feet, measured at the low water line, and the lowest part of the span to be forty feet above highest navigable water, as determined by a straight line connecting the tops of the lower lock gates at the head and foot of the pool in which the bridge is to be built. The other spans may have such grades as may be desired."

The channel span of the bridge, as it was originally built and still stands, is 127 feet long, and the height of the superstructure above low water has been 30.38 feet. The question, therefore, is whether the renewing the superstructure of an old bridge is the building of a bridge, within the meaning of the act of 1888, for we think it cannot be doubted that, if the superstructure could be renewed in any way, the question whether it should be of wood or iron would be one of mere expediency, resting in the preference of the railroad company. In the original grant of authority there was no restriction in respect to the kind of material of which the superstructure should be built. The grant was not for a limited time, shorter than the uses of the railroad company should require. In the nature of things, it must have been known and appreciated that the superstructure of the bridge, especially, would be subject to dilapidation and decay from the effects of time and use, and might be injured or destroyed by fire or flood. It could not have been contemplated that in such case the company should be obliged to relocate and rebuild the masonry composing the piers and abutments of the bridge, so as to make an entirely new bridge. The grant must be construed with reference to the subject-matter, and, while it should be construed liberally in favor of the grantor, it should be construed reasonably, and in such manner as to fulfill the intention of the parties. Conceding that no alteration of the bridge could be made which should derogate from the rights of the public—as, for instance, by making it narrower or lower than it was authorized and built—yet it would seem that, subject to this restriction, the company was authorized to maintain any such bridge at this point as its uses might reasonably require.

We are not required, however, to decide how the case might be if the bridge should be entirely destroyed, and its restoration by a new structure should become necessary. But we have no hesitation in holding that the renewal of parts of the bridge from time to time for the purpose of maintaining it, or better adapting it to the exigencies of business, without substantial change in its form, whether it be done with the same or some other suitable material, is well within the privilege of the company, under the authorization of the original grant. Counsel for the government protests that this view would result in enabling the railroad company to change the entire structure of the bridge, providing it is done piecemeal, and the government would be powerless to stop it. Very likely this might be so. But the government would have no right to stop such changes as are necessary to the maintenance

of the structure, unless it is in position to claim the advantage of all dilapidation or decay, or the insufficiency of some part to sustain a heavier traffic, which might ensue. This would be tantamount to saying that the privilege of the grant would endure only so long as the material of the original bridge should last—a proposition which we think altogether untenable.

It is clear, also, from the language of the act of 1888, that it was not intended to apply to bridges which had already been built under lawful authority. The first section of the act is as follows:

"That any person or corporation having lawful authority to erect a bridge or bridges across the Muskingum river, Ohio, between its mouth and Dresden, may hereafter erect bridges across said river for railroad or other uses, upon compliance with the provisions and requirements of this act, but no bridge shall be erected across said river which does not comply therewith."

And the ninth:

"That the right to alter, amend or repeal this act as to prevent or remove all material obstructions to the navigation of said river by the future construction of bridges is hereby expressly reserved."

And it is evident that the act contemplates as its subject the building of entirely new bridges, having substructures and superstructures, for its regulations involve them. It is true that the word "bridge" is something used in a sense restricted to the span or roadway of a bridge, but that is not the whole of what is generally intended by the word, and especially in the customarily precise language of statutes, as in the act of 1888, where the word "bridge" comprehends not only the span or roadway, but also the supports and abutments thereof. In the common case of delegation to counties or other municipalities of power to build bridges, or to supervise and control them, we are not aware that it has ever been held that less than the whole structure was intended, and such we believe is the common understanding. Howe v. Com'rs of Crawford Co., 47 Pa. 362; Commonwealth v. Pittston Ferry Bridge Co., 148 Pa. 621, 24 Atl. 87; People v. Supervisors of Queen Co., 142 N. Y. 271, 36 N. E. 1062; State v. Commissioners of Gibson Co., 80 Ind. 478, 41 Am. Rep. 821. And in 5 Cyc. 1053, it is said that "both at common law and equally under our statutes a bridge includes the abutments and approaches necessary to make it accessible and convenient for public travel," citing numerous decisions. In A. & E. Encycl. of L. (2d Ed.) 919, in definition, it is stated that it includes the abutments and approaches. In the Case of the Clinton Bridge, 10 Wall. 454, 19 L. Ed. 969, Mr. Justice Nelson said that by the word "bridge" Congress, in declaring it a lawful structure, meant to include its abutments, piers, superstructure, draw, and height. In Bardwell v. Jamaica, 15 Vt. 438, the Supreme Court of Vermont said:

"In speaking of a bridge in connection with the use for which bridges are erected, we can no more exclude the abutment than the flooring or framework of the bridge."

And in Sussex County v. Strader, 18 N. J. Law, 112, 35 Am. Dec. 530, it was said:

"The abutment is as much a part of the bridge as the pier, the arches, or the timbers. It consists of that mass of stone or solid work at the end of the bridge by which the extreme arches or timbers are sustained."

A similar view appears to have been entertained by Goff, Circuit Judge, and Jackson, District Judge, in the case of a bill filed by the United States against the Baltimore & Ohio Railroad Company and the American Bridge Company in the Circuit Court of the United States for the Northern District of West Virginia (no written opinion filed) to restrain the rebuilding of a bridge across the Ohio, and making it a much heavier structure to accommodate the increased weight of motive power and heavier traffic of the railroad company. The United States relied upon the act of February 14, 1883, c. 44, 22 Stat. 414, which forbids the construction of bridges across that river unless the plans are approved by the Secretary of War. But the bridge had been built before the passage of that act, and the injunction prayed was refused.

Our conclusion is that for both reasons—namely, that the renewal of the superstructure, in the circumstances existing, was within the privilege of the company under its grant from the state, and that the act of Congress of August 5, 1886, 24 Stat. 324, c. 929, did not contemplate the application of its provisions to the construction of new parts, in place of old, required for the maintenance of bridges already built under lawful authority—the bill cannot be maintained.

We are of opinion that the decree of the Circuit Court should be affirmed, except so far as it allows costs against the United States, which was probably an inadvertence, and as to which the decree should be reversed.