UNITED STATES v. PARKERSBURG BRANCH R. CO. et al.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1906.)

No. 601.

1. NAVIGABLE WATERS—BRIDGES—POWER TO ENJOIN AS OBSTRUCTIONS.

The right of a railroad company which constructed a bridge over a navigable stream, in conformity to the requirements of an act of Congress authorizing the same to maintain such bridge as a lawful structure, includes the right to repair or to renew the superstructure when necessary to its safe use, and, where it is at all times, both during and after the alteration, kept and maintained in conformity to the act, the courts have no power to enjoin the work or to abate the structure as a nuisance, on the ground that it is an unlawful obstruction to navigation.

2. EMINENT DOMAIN—REQUIRING REMOVAL ON RECONSTRUCTION—RIGHT TO COMPENSATION.

A railroad bridge over a navigable stream, built under authority of an act of Congress which contained no reservation as to repeal, modification, or alteration, can only be required to be removed or replaced by a new bridge constructed, in accordance with Act March 3, 1899, c. 425, 30 Stat. 1121, by an act of Congress authorizing the same and providing for just compensation.

Appeal from the Circuit Court of the United States for the Northern District of West Virginia.

For opinion below, see 134 Fed. 969.

Reese Blizzard, U. S. Atty.

John G. Wilson (Hugh L. Bond, on the brief), for appellees.

Before PRITCHARD, Circuit Judge, and WADDILL, and KELLER, District Judges.

PRITCHARD, Circuit Judge. The United States filed a bill against the Baltimore & Ohio Railroad Company and the Parkersburg Branch Railroad Company operated by the Baltimore Railroad Company, and John W. Davis, receiver of the Parkersburg Railroad Company, alleging that the bridge across the Ohio river, at Parkersburg, is an obstruction to navigation at that point, and a great injury to the commerce on the Ohio river. The allegations of the bill are supported by sundry affidavits, some 15 in number. The relief demanded is an injunction to restrain and enjoin the appellees, their agents, and all others acting under them, from constructing or proceeding to construct "the contemplated bridge across the Ohio river between Parkersburg and Belpre." The appellees filed their answer, claiming that, under an act of Congress approved July 14, 1862 (chapter 167, 12 Stat. 569), they were authorized to build and construct said bridge subject to the terms and limitations as expressed in that act; that a bridge was not only built and constructed in compliance with the terms and provisions of the act, but that the appellees did more than they were required to do in building and constructing two channel spans instead of one, and giving greater space of waterway between the stone piers for navigation than was required by the act.

The only question presented for our consideration is whether the court below erred in refusing to grant an injunction against the appellees.

It is insisted by counsel for appellant that the bridge in question is such as to impede navigation; that, while it was properly constructed at the time of its erection, the changed conditions in trade and commerce and navigation are such that the bridge is not now in conformity with the several acts of Congress regulating the construction of bridges across navigable rivers, etc. It is further contended that the appellees have erected a new bridge, in violation of Act of Cong. March 3, 1899, c. 425, 30 Stat. 1121. It is shown by the bill that this bridge was erected under the authority and in accordance with the act of July 14, 1862. But to support the bill for an injunction the complainant alleges that, the bridge thus authorized and declared

to be a lawful structure having become worn out, appellees are building a new bridge on the same site, without the assent of Congress and without the approval of the Secretary of War, as provided in section 9 of the act of Congress of March 3, 1899 (30 Stat. 1151 [U. S. Comp. St. 1901, p. 3540]). It is further alleged that in the building of this new structure temporary trestle work will be placed between the piers narrowing the main channel span. The last allegation as to temporary trestle work is denied under oath in the answer, and the testimony shows that no false work of any kind was erected between the piers. The act of 1862, among other things, provided that bridges erected thereon should have unobstructed headways in the channel of the river of not less than 90 feet above low-water mark, and that such channels or waterways should have a width of not less than 300 feet between the piers next to said channel or waterways, and one of the spans adjoining thereto should not be less than 220 feet in length.

This bridge was constructed in accordance with the provisions of the Act of 1862, as appears from the report of the board of engineers upon bridges across the Ohio river dated April 19, 1871, a portion of which reads as follows:

"The bridge accordingly was built of the required height and with two practical channel ways of 318 feet each. As the law only required one channel space of 300 feet, the bridge company are deserving of very great credit in not only providing two channel spaces instead of one, but in making each eighteen feet wider than required by law for the widest." U. S. Engineers' Report, p. 47.

"It was the original intention of the company to have built this bridge exactly like that at Bellaire, but after they had started the piers of their main channel span, a protest was made against this span by the coal boat interests. The latter claimed that, although the main span was over the deepest water of the river, it was yet not over the coal boat channel, as the very abrupt bend in the Ohio just below the bridge made it necessary for coal tows to hug the Ohio shore that they might not drift onto the Virginia shore after passing the bridge. An estimate was made of the cost of making an additional channel span near the Ohio shore, and it was found that it would increase the cost of the bridge by $60,000.00. The railroad, however, very liberally offered to bear half of this additional expense provided the coal men furnished the other half. The latter decided that, unless they obtained the new channel span, they might in a single year lose more by collision or by running ashore than the sum required, and therefore the money was advanced at once.

"The board have no changes to recommend in this bridge which like the one at Bellaire has been admirably built and with the most liberal care for the interest of navigation. It is a possibility that in the future it will be found that the main spans of these bridges are too narrow. Should that prove to be the case, we think that any change that may subsequently become necessary should be made at the national expense. The total cost of this bridge, as reported by the Chief Engineer, Jas. L. Randolph, has been $1,223,500."

The superstructure of this bridge which was made lawful by the act of 1862, and approved by the government engineers as being a "lawful structure," in the course of time became worn out to such an extent as to render its renewal necessary in order to insure the safety of passengers and the transportation of commerce. From the time of the erection of the bridge under the act of 1862, until the filing of the bill in this case, there was no objection made as to

the manner of its construction.   It is therefore necessary that we should determine whether the acts complained of are such as to justify the contention that the appellees are constructing a new bridge.   The piers as originally constructed remain intact and occupy the same relative position as when originally constructed in conformity with the act of Congress and approved by the government engineers as a "lawful structure," and the only change that has been made is the renewal of the superstructure, the erection of which affords every facility for navigation which was enjoyed when the original superstructure was placed on the piers.   If the building of the superstructure can be held to be the erection of a new bridge, then the removal of cross-ties and the substitution of new rails could also be held to be prohibited by the act of 1899.

It appears from the record that nothing was done to the bridge, except to renew the superstructure, which was placed on the original piers 90 feet high—there being nothing done which could in the slightest degree interfere with navigation.   The superstructure being renewed from time to time without any interruption to traffic.   There is not a scintilla of evidence to support the appellant's contention that a new bridge is being built.   Under these circumstances the Circuit Court would have no power to grant an injunction, because there is nothing in the record to show that a new bridge has been erected or that it is the purpose of appellees to erect such a structure.

The case of United States v. C. & M. R. R. Co., 134 Fed. 353, 67 C. C. A. 335, is in point, the facts of which are as follows:   The United States sought by bill to restrain the Cincinnati & Muskingum Valley Railroad Company from renewing the superstructure of its bridge over the Muskingum river.   The bridge was a lawful structure erected in 1870, under the authority granted by the board of public works of the state of Ohio as follows:

"Ordered that the application of Hon. J. J. Jewett, president Cincinnati & Washington Valley Railroad Company, permit it to build a bridge over the Muskingum river above Jackson Island, and also on the side cut of the Ohio canal, at Dresden, be and the same is hereby granted, and that plots of the same on file in this office be approved with the proviso that if at any time hereafter the interest of navigation on the Muskingum river should require it the said railroad company will modify the bridge by inserting a draw in the same."

Congress assumed control of this river in 1886, and in 1888 passed an act, the third section of which was the foundation of this proceeding (Act April 2, 1888, c. 53, 25 Stat. 74).   In discussing the questions involved the court, among other things, said:

"The original bridge of the railroad company was built 30 or more years ago, with piers and abutments of stone and a wooden superstructure. The bridge was built in conformity with the authorization of the state, and was maintained in its form and materials of construction until 1903, when the superstructure having become unsafe on account of age, decay, and wear, the railroad company resolved to replace it with one of iron.

"The government objects to this, not so much, as we infer, because it is proposed to build the superstructure of iron, but because the railroad company cannot lawfully rebuild it at all without conforming its entire bridge, including its piers and abutments, to said section 3 of the said act of Congress of 1888 which reads as follows: 'That if the bridge be built as a con-

tinuous bridge, it shall have at least one channel span, the centre of which shall be in the middle of the channel usually run in high stages by steamboats descending the river with barges or rafts in tow; said channel span to have a clear opening of two hundred and fifty feet, measured at the low water line, and the lowest part of the span to be forty feet above highest navigable water, as determined by a straight line connecting the tops of the lower lock gates at the head and foot of the pool in which the bridge is to be built. The other spans may have such grades as may be desired.'

"The channel span of the bridge, as it·was originally built and still stands, is 127 feet long, and the height of the superstructure above low water has been 30.38 feet. The question, therefore, is whether the renewing of the superstructure of an old bridge is the building of a bridge, within the meaning of the act of 1888, for we think that it cannot be doubted that, if the superstructure could be renewed in any way, the question whether it should be of wood or iron would be one of mere expediency, resting in the preference of the railroad company. In the original grant of authority there was no restriction in respect to the kind of material of which the superstructure should be built. The grant was not for a limited time, shorter than the uses of the railroad company should require. In the nature of things it must have been known and appreciated that the superstructure of the bridge, especially, would be subject to dilapidation and decay from the effects of time and use, and might be injured or destroyed by fire or flood. It could not have been contemplated that in such case the company· should be obliged to relocate and rebuild the masonry composing the piers and abutments of the bridge, so as to make an entirely new bridge. The grant must be construed with reference to the subject-matter, and, while it should be construed liberally in favor of the grantor, it should be construed reasonably, and in such manner as to fulfill the intention of· the parties. Conceding that no alteration of the bridge could be made which should derogate from the rights of the public—as, for instance, by making it narrower or lower than it was authorized and built—yet it would seem that, subject to this restriction, the company was authorized to maintain any such bridge at this point as its uses might reasonably require.

"We are not required, however, to decide how the case might be if the bridge should be entirely destroyed, and its restoration by a new structure should become necessary. But we have no hesitation in holding that the renewal of parts of the bridge from time to time for the purpose of maintaining it, or better adapting it to the exigencies of the business, without substantial change in its form, whether it be done with the same or some other suitable material, is well within the privilege of the company, under the authorization of the original grant. Counsel for the government protest that this view would result in enabling the railroad company to change the entire structure of the bridge, providing it is done piecemeal, and the government would be powerless to stop it. Very likely this would be so. But the government would have no right to stop such changes as are necessary to the maintainance of the structure, unless it is in position to claim advantage of all dilapidation or decay, or the insufficiency of some part to sustain heavier traffic, which might ensue. This would be tantamount to saying that the privilege of the grant would endure only so long as the material of the original bridge should last—a proposition which we think altogether untenable. * * *

"And it is evident that the act contemplates as.its subject the building of entirely new bridges, having substructures and superstructures, for its regulations involve them. * * *

"A similar view appears to have been entertained by Goff, Circuit Judge, and Jackson, District Judge, in the case of a bill filed by the United States against the Baltimore & Ohio Railroad Company and the American Bridge Company in the Circuit Court of the United States for the Northern District of West Virginia (no written opinion filed) to restrain the rebuilding of a bridge across the Ohio, and making it a much heavier structure to accommodate the increased weight of motive power and heavier traffic of the

railroad company. The United States relied upon Act February 14, 1883, c. 44, 22 Stat. 414, which forbids the construction of bridges across that river unless the plans are approved by the Secretary of War. But the bridge had been built before the passage of that act, and the injunction prayed was refused.

"Our conclusion is that for both reasons—namely, that the renewal of the superstructure, in the circumstances existing, was within the privilege of the company under its grant from the state, and that Act Cong. August 5, 1886, c. 929, 24 Stat. 324, did not contemplate the application of its provisions to the construction of new parts, in place of old, required for the maintenance of bridges already built under lawful authority—the bill cannot be maintained. Or, as expressed by the Circuit Court below: The superstructure cannot be regarded as the bridge within the meaning of the act, and the changing of the superstructure will not be the erection of a new bridge in violation of the act."

In the case of Central Co. v. Wabash Railway Co. (C. C.) 32 Fed. 566, a proceeding instituted to recover damage for a failure to properly remove piling used, the court decided as stated in the syllabus:

"The grant of power to a railroad company to bridge a navigable stream carries with it as a necessary incident the right to repair."

The language of the act, under which this bridge was erected contemplates its permanent use. There is nothing to be found therein which justifies the assumption that the bridge was to be constructed for temporary use, or until it should become an obstruction to navigation; but, among other things, the right is granted to charge tolls for the use thereof as long as the balance of the appellees' lines were operated ("no higher charge * * * than the rate per mile which the company may from time to time receive for the balance of their line"), coupled with the provision that the river interest should be so regulated as to conform to the construction of the bridge. Neither is it provided that the life of post routes should be limited to the life of the original superstructure or any portion of it. Even if it could be shown that the bridge as now constructed is an obstruction to navigation, the court would be powerless by injunction to abate it as a nuisance, in the absence of appropriate legislation by Congress.

The acts of Congress passed subsequent to the erection of this bridge cannot be construed to relate to, or to in any wise effect, the manner of its construction, and were evidently intended to apply to bridges that might be erected subsequent to the adoption of the same. There is no provision to be found in any of these acts which undertakes to regulate the building or repairing of bridges that may have been built and legalized under the act of 1862. The act of 1862 contains no reservation of any right of the government to amend or modify or repeal the same. Under it the owners of the bridge were vested with a permanent franchise the moment they complied with its terms, and it is therefore property of which they cannot be divested without due process of law and just compensation.

In view of the fact that the appellees constructed the bridge under the act of July 14, 1862, in strict accordance with its terms, we do not think that Congress has the power to direct such changes to be made as may be deemed necessary to the interest of navigation without providing compensation for the same. Here we have an act

which grants an unconditional license, in pursuance of which the owners of the bridge have invested their money and thereby acquired certain rights and franchises.

It is contended by counsel for appellant that the right granted the owners of the bridge by the Act of July 14, 1862, is simply a license which may be revoked at any time, and in support of this contention the case of Newport & Cincinnati R. R. Co. v. United States, 105 U. S. 470, 26 L. Ed. 1143, is cited. That case is not analogous to the one now before the court. The resolution which gave the assent of Congress to the erection of the Newport & Cincinnati Bridge (March 3, 1869) reserved the right to alter or modify the bridge at any time so as to prevent obstructions to the river.

In the case of United States v. Lynah, 188 U. S. 471, 23 Sup. Ct. 349, 47 L. Ed. 539, in discussing the right of Congress to regulate commerce, the court said:

"* * * But, if any one proposition can be considered as settled by the decisions of this court, it is that, although in the discharge of its duties the government may appropriate property, it cannot do so without being liable to the obligation cast by the fifth amendment of paying just compensation. * * * Undoubtedly compensation must be made or secured to the owner when that which is done is to be regarded as a taking of private property for public use, within the meaning of the fifth amendment of the Constitution; and, of course, in its exercise of the power to regulate commerce, Congress may not override the provision that just compensation must be made when private property is taken for public use."

In the Monongahela Navigation Case, 148 U. S. 325, 13 Sup. Ct. 622, 37 L. Ed. 463, it is held that when a franchise was granted without reservation by State authority, and in pursuance of which a lock and dam were erected, accompanied by an implied invitation by the United States to proceed with such construction, it vests the company with a permanent franchise in the property, as well as the right of the owners to take toll; and that, under such conditions, the power to regulate commerce is wanting unless just compensation is provided for in accordance with the fifth amendment. In that case the franchise was granted by the state, but in the case at bar the authority to erect the bridge was granted by Congress, and it was erected in pursuance thereof. It thus became private property which could not be taken, in the absence of legislation providing for just compensation. In the case of United States v. Keokuk & Bridge Company (D. C.) 45 Fed. 180, the court said:

"* * * Until Congress, however, requires it to be remodeled or removed, it certainly cannot be claimed that the bridge company is liable in any form of proceeding to be fined or punished for maintaining the bridge, or that the structure can be judicially declared a nuisance, and abatable as such. The ruling of the Supreme Court in the Wheeling, etc., Bridge Case, 18 How. 421, 15 L. Ed. 435, is conclusive upon this proposition. It follows therefore that, if a bridge is constructed in accordance with the provisions of an act of Congress authorizing its erection, it is, when thus constructed, a legal structure, and its status in this particular cannot be changed by judicial action or by any power short of that which legalized it in the beginning.

In view of these authorities we are of opinion: First, that the allegations contained in the bill to the effect that the bridge in question is a

new structure are not sustained by the evidence, and therefore an injunction will not lie to restrain the railroad company or to abate the bridge as a nuisance; second, that the bridge having been built in conformity with the act of July 14, 1862, which contained no reservation as to repeal, modification, or alteration, the only means by which the structure as now constituted can be removed, and a new bridge constructed in lieu thereof, in accordance with the act of March 3, 1899, would be by act of Congress authorizing the same and providing for just compensation. Therefore the action of the Circuit Court in refusing an injunction was proper.

Affirmed.