## UNITED STATES v. LOUISVILLE BRIDGE CO.

(District Court, W. D. Kentucky. May 20, 1916.)

1. CONSTITUTIONAL LAW &⫯291—EMINENT DOMAIN &⫯2(1)—"TAKING" OF PROPERTY—WHAT CONSTITUTES.

   To require an owner of a bridge over a navigable river to alter it, so as to prevent obstructions to navigation, does not constitute a "taking" of property within Const. U. S. Amend. 5.

   [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 870–876; Dec. Dig. &⫯291; Eminent Domain, Cent. Dig. §§ 3–8; Dec. Dig. &⫯2(1).

   For other definitions, see Words and Phrases, First and Second Series, Taking.]

2. NAVIGABLE WATERS &⫯20(2)—OBSTRUCTION—BRIDGES—STATUTES.

   A corporation which constructed a bridge across the Ohio river was organized under 2 Acts Ky. 1855–56, c. 747, and Acts 1861–63, c. 385, to construct a bridge so as not to obstruct navigation further than the laws of the United States and decisions of the Supreme Court of the United States should hold to be legal. The bridge was built under Act Cong. July 14, 1862, c. 167, 12 Stat. 569, and Act Cong. Feb. 17, 1865, c. 38, 13 Stat. 431. Held, that the requirement of the charter of the bridge corporation that it should not obstruct navigation further than allowed by the laws of the United States and decisions of the Supreme Court required the structure always to meet those conditions.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 74–82, 83; Dec. Dig. &⫯20(2).]

3. COMMERCE &⫯57—NAVIGABLE STREAMS—BRIDGES—POWERS OF CONGRESS.

   Act March 3, 1899, c. 425, § 18, 30 Stat. 1153 (Comp. St. 1913, § 9970), authorizing the Secretary of War to require changes in bridges over navigable streams when navigation is unduly impeded, is valid in so far as it applies to a bridge constructed across the Ohio river under Acts Cong. July 14, 1862, and Feb. 17, 1865, authorizing the construction of bridges as part of post routes and referring to the right to construct the bridge as a privilege, though the acts made no provision for amendment, for

&⫯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

there was no express limitation on the power of subsequent Congresses, and such legislation is justified under the power to regulate interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 72–76, 88, 90, 92–102; Dec. Dig. ☞57.]

4. EMINENT DOMAIN ☞2(1)—NAVIGABLE WATERS ☞20(6)—BRIDGES—ALTERATIONS—COMPENSATION.

As Act Cong. March 3, 1899, § 18, authorizing the Secretary of War to require changes to be made in bridges over navigable streams, when navigation is unduly impeded, makes no provision for compensation for expense of changes, none can be allowed the bridge owners by the District Court, there being no taking of their property.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 3–8; Dec. Dig. ☞2(1); Navigable Waters, Cent. Dig. § 91; Dec. Dig. ☞20(6).]

5. EMINENT DOMAIN ☞2(1)—TAKING OF PROPERTY—COMPENSATION.

To entitle a person to compensation under Const. U. S. Amend. 5, prohibiting the taking of private property for public use without compensation, there must be an actual taking of property for public use, and not a mere injury to property without a taking.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 3–8; Dec. Dig. ☞2(1).]

6. NAVIGABLE WATERS ☞26(1)—INJUNCTION—FEDERAL COURTS—JURISDICTION—COURT OF CLAIMS.

Where, under Act Cong. March 3, 1899, § 18, a bridge company was required to reconstruct its bridge over a navigable stream, an injunction necessitating compliance will not be denied, upon the claim that the acts under which the bridge was constructed constituted a contract, or that the company was entitled to compensation, for those matters should be presented to the Court of Claims, under Judicial Code (Act March 3, 1911, c. 231) § 145, 36 Stat. 1136 (Comp. St. 1913, § 1136), or to Congress.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 135–143; Dec. Dig. ☞26(1).]

In Equity. Bill by the United States against the Louisville Bridge Company. Injunction granted.

Perry B. Miller, U. S. Dist. Atty., of Louisville, Ky.

Chas. H. Gibson and William W. Crawford, both of Louisville, Ky., for defendant.

EVANS, District Judge. By an act approved February 17, 1865 (13 Stat. 431, c. 38), authority was given the Louisville & Nashville Railroad Company and the Jeffersonville Railroad Company (stockholders in the Louisville Bridge Company) to construct a railroad bridge of a specified character over the Ohio river at the head of the Falls of the Ohio. The authority thus given was made subject to the provisions of a previous act approved July 14, 1862 (12 Stats. 569, c. 167).

Under its charter and the authority given by Congress the defendant constructed its bridge. After its completion in 1870 it was inspected by the Board of Engineers of the United States Army. When certifying the result to the government and to the defendant, among other things the Board said:

"The board have no changes to recommend in this bridge, which they consider a first-class structure throughout, and very much less an obstruction

than it might have been, had its builders limited themselves to giving only what they were compelled by law to give. On the contrary, they have chosen to build according to the highest of the three authorized plans, and have exceeded the heights and widths that even this plan required, spending $150,000 more than was necessary to comply with the letter of the law. Instead of a 300-foot opening at low water, one of their channel spans gives 380 feet, and the other 352¼ feet."

During the 45 years which have followed, the bridge, thus constructed, has been continuously used as a railroad bridge.

By the eighteenth section of the act approved March 3, 1899 (30 Stats. 1153, c. 425), making appropriations for the construction, repair, and preservation of certain public works on rivers and for other purposes, the Secretary of War was authorized, and it was made his duty, when he had good reason to believe that any railroad or other bridge then constructed or which might thereafter be constructed over any of the navigable waterways of the United States was an unreasonable obstruction to the free navigation of such waters, or was of insufficient height, or width of span, or otherwise, or where there was difficulty in passing the draw by rafts, steamboats, or other water craft, after giving the bridge owner reasonable opportunity to be heard, to give notice to such owner, specifying the changes required and the time within which they were reasonably to be completed. Penalties were prescribed for failure to make the changes required, etc.

It is conceded that all the preliminary steps required by the section were properly taken by the Secretary of War. Afterwards that officer in due course served upon the defendants a notice as follows:

"Form No. 6.

"War Department.

"Washington, D. C., December 12th, 1914.
"To Charles H. Gibson, President Louisville Bridge Company, 906 Realty Building, Louisville, Kentucky:

"Take notice that—Whereas, the Secretary of War has good reason to believe that the bridge of the Louisville Bridge Company across the Ohio river at Louisville, Kentucky (commonly known as the 'Ohio Falls' bridge), is an unreasonable obstruction to the free navigation of the said Ohio river (which is one of the navigable waterways of the United States) on account of (1) insufficient horizontal clearance of the channel span crossing the main navigable channel known as 'Indiana Chute,' and (2) insufficient width of opening in the existing swing span crossing the Louisville and Portland Canal.

"And whereas, the following alterations, which have been recommended by the Chief of Engineers, are required to render navigation through or under it reasonably free, easy, and unobstructed, to wit:

"(1) That the span of said bridge crossing 'Indiana Chute' be so changed as to provide a horizontal opening 600 feet wide in the clear.

"(2) That the existing swing span of said bridge across the Louisville and Portland Canal, be changed to a lift span giving a horizontal chearance of 200 feet, and a vertical clearance, when open, of 78 feet above pool level of 412 feet, U. S. datum.

"And whereas, three years from the date of service of this notice, is a reasonable time in which to alter the said bridge as described above:

"Now, therefore, in obedience to, and by virtue of, section eighteen of an act of the Congress of the United States entitled 'An act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes,' approved March 3, 1899, the Secretary of War does hereby notify the said Louisville Bridge Company to alter the said bridge as described above, and prescribes that said alterations shall

be made and completed on or before three years from the date of service hereof. [Signed] Lindley M. Garrison, Secretary of War."

The response of the Bridge Company to this notice was as follows:

"Louisville Bridge Company.

"President's Office.

"Louisville, Nov. 26, 1915.

"To the Secretary of War, Washington, D. C.:

"In re Reconstruction of Superstructure of Louisville Bridge.

"Referring to the correspondence and conference heretofore had concerning the above matter, I beg to advise you that I am instructed to say:

"First. The Louisville Bridge Company claims and insists on the right to renew its superstructure on the existing masonry, without making any changes in the length of any of the existing spans, so that, when completed, it will not interfere with navigation any more than it does now.

Second. The company intends to at once commence and continue the work of renewing its superstructure as above stated, it being its purpose to first reconstruct the five northern spans of the bridge, including the span over the Indiana channel.

"If you desire it, detailed plans showing the proposed reconstruction will be furnished you.

"Very respectfully, [Signed] Chas. H. Gibson, President."

In this situation the United States filed its bill of complaint against the defendant, in which, having stated in substance that the defendant had failed and refused, and intended to continue to fail and refuse, to comply with the notice given by the Secretary of War, prayed the court to enjoin the defendant from erecting, or causing to be erected, or from taking any steps whatsoever towards the erection, or the causing of the erection, of a bridge contrary to the requirements set forth in the notice of the Secretary of War aforesaid, or from reconstructing the superstructure of its present bridge upon its present piers in such a manner as to leave a span contrary to the provisions of said order and notice of the Secretary of War, or from taking any steps whatsoever to that end, or from doing any of the matters or things which it threatens to do in its letter of November 26, 1915.

The defendant answered the bill, and the parties filed a stipulation agreeing that the material facts were as therein set forth; but we are stating only such of them as may be essential for present purposes. One clause in their agreement was in this language, namely:

"It is expressly agreed and here stipulated between complainant and respondent that the sole question to be determined in this case is the legality of the order of the Secretary of War as applied to the bridge of the respondent."

The case thus presented is of very great importance, alike to the defendant and to the public, and the general question upon which it is agreed the decision must turn, and various illustrative propositions supposed more or less to bear upon it, have been discussed with great earnestness and ability. While, in view of the certainty of an appeal, it is not necessary that we should go into much detail, we will, as briefly and clearly as may be, state the grounds upon which we rest our conclusion.

[1] Section 18 of the act of 1899 has often been under consideration by the Supreme Court. Its constitutionality has been called in

question, but the court distinctly held it to be constitutional in Union Bridge Co. v. United States, 204 U. S. 364, 388, 27 Sup. Ct. 367, 51 L. Ed. 523, Monongahela Bridge Co. v. United States, 216 U. S. 177, 30 Sup. Ct. 356, 54 L. Ed. 435, and Hannibal Bridge Co. v. United States, 221 U. S. 194, 31 Sup. Ct. 603, 55 L. Ed. 699.

While this general proposition must be regarded as settled, nevertheless attempted applications of the provisions of the section possibly might be subject to constitutional restriction. To illustrate: There is no clause in the act of 1862, or in that of 1865, either authorizing or forbidding renewals of the superstructure. There is no clause in either act reserving the power to amend its provisions, and there is nothing in section 18 of the act of 1899 which gives or contemplates the giving of compensation to the owner of a bridge in case the Secretary of War shall act under its provisions. In view of this condition of applicable legislation, the defendant insists that the Secretary's order, though within the letter of the statute, would, if enforced, be an unconstitutional violation of its rights, first, because, in the absence of the reservation of the right to amend the previous acts, Congress could not make section 18 of the act of 1899 applicable to this bridge; and, second, because to put the Secretary's order into effect would take the defendant's property to the extent of at least $450,000 for public use without compensation, in violation of the fifth amendment to the Constitution of the United States. The last of these propositions must be regarded as having been definitely foreclosed when the Supreme Court in Hannibal Bridge Co. v. United States, 221 U. S. 194, 205, 31 Sup. Ct. 603, 606 (55 L. Ed. 699), said:

"It is also firmly settled that such alterations of bridges over the navigable waters of the United States as the Chief of Engineers recommended, and as the Secretary of War required to be made after notice and hearing the parties interested, was not a taking of the property of the owners of such bridges within the meaning of the Constitution. Union Bridge Company v. United States, 204 U. S. 364 [27 Sup. Ct. 367, 51 L. Ed. 523]; Monongahela Bridge Co. v. United States, 216 U. S. 177 [30 Sup. Ct. 356, 54 L. Ed. 435]; Field v. Clark, 143 U. S. 649 [12 Sup. Ct. 495, 36 L. Ed. 294]; Buttfield v. Stranahan, 192 U. S. 470 [24 Sup. Ct. 349, 48 L. Ed. 525]."

[2, 3] But the question whether section 18 of the act of 1899 can be applied to this case, in the absence from the acts of 1862 and 1865 of any reservation of the right to amend them, and without providing for compensation, is of vital importance, and cannot be so easily disposed of. We may examine the general proposition from several standpoints.

The act of July 14, 1862 (12 Stat. 569, c. 167), is entitled "An act to establish certain post roads." In its first and second sections it declared two certain bridges authorized by state legislation to be lawful structures. By the third section it was made lawful for other railroad companies, pursuant to their respective charters, to build bridges across the upper Ohio river. The fourth section provided that "any bridge erected under the privileges of this act" may be built in the way prescribed in the section. By the fifth section it is enacted that bridges erected under the provisions of the act shall be lawful structures and known as post routes. The act of February 17, 1865, was, as we have seen, supplemental to the act of 1862, and amended it, so

"as to authorize" two certain railroad companies, stockholders in the Louisville Bridge Company, to construct the railroad bridge now in question. The defendant is a Kentucky corporation, its charter being an act of the Legislature of that state approved March 10, 1856, found in volume 2 of the Acts of 1855–56, at page 426, and which is therein declared to be a "public law." A proviso in the second section of the act is in these words:

"Provided, that said bridge shall be constructed so as not to obstruct navigation further than the laws of the United States and the decisions of the Supreme Court of the United States shall hold to be legal." [1]

By another act of the Kentucky Legislature (1 Acts 1861–63, p. 153) it was provided "that the charter of the Louisville Bridge Company, approved the 10th of March, 1856, be revived and confirmed to James Guthrie" [2] and others, who were invested with all the powers and rights conferred by the charter.

An act of the Legislature of Kentucky approved February 14, 1856 (1 Acts 1855–56, p. 15), reserved power in the Legislature "to amend or repeal charters and other laws." This was the first appearance of this character of legislation in a general law of the state, but it has been carried forward in all later compilations of our statutes, and it antedated all the legislation, either state or national, to which we have referred.

It will be observed that the act of 1862 speaks of bridges erected under the "privileges" of the act, and the act of 1865 so amends that of 1862 "as to authorize" certain railroads to build a bridge at the head of the Falls of the Ohio, and it is argued in behalf of the government that the grant of the privilege and authority thus given to the Kentucky corporation did not make a contract with it. Undoubtedly what was done by the acts of 1862 and 1865 was only to give the Bridge Company the privilege and authority to erect a bridge as contemplated by its charter, proviso included. This made the bridge a lawful structure—that is, a bridge built over a navigable stream under the sanction and authority of a law of the United States. The defendant was thus given a privilege indispensable to its existence, viz., that of permanently using for its own exclusive purposes part of the public domain extending from one bank of a navigable river to the other. In this way the defendant was enabled to erect and maintain a great and costly bridge, and has enjoyed the profitable privilege for many years. But do these facts bring into view anything which fills any definition of the word "contract"? It may not be possible to answer this question in the affirmative, in the absence from the acts of 1862 and 1865 of language which justifies the conclusion that Congress at the time had in contemplation either the making of a contract itself, or giving authority to the United States to make a contract in

[1] This proviso is substantially similar to that in the charter of the Union Bridge Company, which is found in 204 U. S. at page 367, 27 Sup. Ct. 367, 51 L. Ed. 523, and in that of the Monongahela Bridge Co., found in 216 U. S. 187, 30 Sup. Ct. 356, 54 L. Ed. 435.

[2] Mr. Guthrie was then president of the Louisville & Nashville Railroad Company.

the premises, which could not be altered or changed without the con-- sent of the Bridge Company.

That clause of the Constitution which inhibits state (though not federal) legislation impairing the obligation of contracts has been the subject of consideration in innumerable cases, and the wisdom and justice of it have been vindicated beyond the possibility of further doubt. Beginning probably with the Dartmouth College Case, the Supreme Court has made many decisions annulling state laws, which, in one way or another, had infringed this constitutional provision. Among those decisions were such as had applied it to state charters of corporations. Such charters were held to be contracts which could not, without the consent of the corporation, be changed, unless power to do so had been reserved.

Resulting from this situation it became almost universally customary in state legislation to reserve such power either in the charter itself or in the general laws, as was done in Kentucky by the act of February 14, 1856, supra. The custom thus fixed from necessity in state legislation began in 1869 out of abundant caution to manifest itself in congressional enactments respecting authority to build bridges over navigable waters, and in many of the cases against bridge companies such reservations simplified the questions to be decided. We cannot suppose, however, that this custom has been exalted into constitutional sanctity, nor that it has in any wise diminished or affected that power of Congress which finds its warrant in the provision that "the Congress shall have power * * * to regulate commerce with foreign nations, and among the several states"—words which, decided cases will possibly show, have developed greater and more varied potentialities than any similar number of words ever uttered by man.

While in many instances Congress, had it seen fit to do so, might have ameliorated and softened some apparently harsh results by provisions requiring compensation therefor, it has not done so in section 18 of the act of 1899. Many instances of the ruthless results of legislation under the commerce clause of the Constitution have appeared where the courts, and especially the Supreme Court, have found no power to avoid them. The case of Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, is one of the most striking of these. There Mottley and his wife, in 1871, having been severely injured while traveling on one of the trains of the Railroad Company, made a contract with the Railroad Company whereby the parties settled the claims for compensation for the injuries inflicted by agreeing that the Railroad Company should give the injured persons passes over its entire line of railroad during their natural lives respectively. This contract continued in force for nearly 40 years, when the Railroad Company sought to annul it under the provisions of the Interstate Commerce Act of 1887, as amended in 1906 (Act June 29, 1906, c. 3591, 34 Stat. 584), and the court held that that must be the result, because the contract must be considered to have been entered into in contemplation of the possibility that Congress might, at some future time, if the public interest demanded it, exert its power to annul it under the

commerce clause of the Constitution.    Many instances were cited where similar principles were applied, and the court particularly emphasized what it had held in Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, and quoted from page 228, 20 Sup. Ct. 96, at page 102 [44 L. Ed. 136], where, among other things, it had said:

"The reasons which may have caused the framers of the Constitution to repose the power to regulate interstate commerce in Congress do not, however, affect or limit the extent of the power itself. In Gibbons v. Ogden, supra [9 Wheat. 1, 6 L. Ed. 23], the power was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. Under this grant of power to Congress, that body, in our judgment, may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations, where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce (and when we speak of interstate we also include in our meaning foreign commerce). We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts of the class mentioned. The power to regulate interstate commerce is, as stated by Chief Justice Marshall, full and complete in Congress, and there is no limitation in the grant of the power which excludes private contracts of the nature in question from the jurisdiction of that body."

The general principle applied in the Mottley Case has, as the opinion shows, controlled several other cases, where it was held that the power of Congress to regulate commerce was unlimited, unless some provision in the Constitution itself could be found which interposed a barrier. These general principles have a strong bearing upon the case before us.

[4, 5] Whether or not there is a contract, express or implied, between the United States and the defendant, arising out of the acts of 1862 and 1865, and the erection, on the faith thereof, of the defendant's bridge, can the government alter or withdraw the privilege or authority given by those acts, and enforce against the defendant the provisions of section 18 of the act of 1899, without giving defendant compensation to be measured by the increased cost? Certainly nothing can be found in the language of either of the acts which indicates that Congress intended either to bind itself or to bind the United States not to modify or withdraw the privilege or authority given the defendant, or to require the United States to make compensation in case the Secretary of War acted under section 18.

Nevertheless Judge Jackson, of the District Court of West Virginia, in United States v. Parkersburg, etc., R. R. Co., 134 Fed. 969, 972 (the Parkersburg Bridge Case), held that relief similar to that here sought by the United States could not be granted without giving the defendant compensation. In support of this view he cited Mc-Gahey v. Virginia, 135 U. S. 693, 10 Sup. Ct. 972, 34 L. Ed. 304, though that case was one of many cases where the sole question involved was whether state legislation could impair the obligation of a contract. The judgment of Judge Jackson was affirmed by the Circuit Court of Appeals (Fourth Circuit) in 143 Fed. 224, 74 C. C. A.

354. The syllabi to that report correctly show the points decided to be as follows:

"1. The right of a railroad company which constructed a bridge over a navigable stream, in conformity to the requirements of an act of Congress authorizing the same to maintain such bridge as a lawful structure, includes the right to repair or to renew the superstructure when necessary to its safe use, and where it is at all times, both during and after the alteration, kept and maintained in conformity to the act, the courts have no power to enjoin the work or to abate the structure as a nuisance, on the ground that it is an unlawful obstruction to navigation.

"2. A railroad bridge over a navigable stream, built under authority of an act of Congress which contained no reservation as to repeal, modification, or alteration, can only be required to be removed or replaced by a new bridge constructed, in accordance with Act March 3, 1899, c. 425, 30 Stat. 1121, by an act of Congress authorizing the same and providing for just compensation."

The learned court, in its opinion, alluded to the case of Bridge Co. v. United States, 105 U. S. 470, 26 L. Ed. 1143, but said it was not applicable. Besides several cases decided by the lower federal courts, it cited the case of United States v. Cincinnati, etc., Co., 134 Fed. 353, 67 C. C. A. 335, decided by the Circuit Court of Appeals of the Sixth Circuit, and which arose under an act approved April 2, 1888 (25 Stat. 74, c. 53), the only important question being whether the replacement of a wooden bridge by an iron one was the erection of a new bridge, and this was decided in the negative. The court (143 Fed. 224, 74 C. C. A. 354) also cited two cases decided by the Supreme Court, the earliest of which was Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463. That was a proceeding under an act of Congress for the condemnation by the United States for public use of property known as the "upper lock and dam" owned by the Navigation Company, and of course compensation was allowed. The other case cited by the court was United States v. Lynah, 188 U. S. 445, 23 Sup. Ct. 349, 47 L. Ed. 539, in which Lynah had sued the United States to recover the value of certain land taken and appropriated by the government for the construction of dams in the Savannah river. The court held that there was an implied contract to pay the value of the land taken and affirmed the judgment in favor of the plaintiff therefor.

Whether or not the cases cited support the rulings in the Parkersburg Bridge Case, we do not feel free to follow those rulings, because of what has been said in many later cases, although in United States v. Baltimore & Ohio R. R. Co., 229 U. S. 244, 254, 33 Sup. Ct. 850, 853 (57 L. Ed. 1169), the Supreme Court said:

"How far, if at all, the grant of the right to build the bridge under the terms specified in the act of 1862, with no reservation of the right to alter or amend, will operate to limit the power of Congress to directly legislate on the subject of the removal or alteration of the bridge, is a question we are not here concerned with, and therefore express no opinion upon it"

—and although practically the same reservation was made in Bridge Co. v. United States, 105 U. S. 476, 26 L. Ed. 1143. While the question did not concern the court in those cases, in other cases, decided since that of the Parkersburg Bridge, it was given what we must suppose are such strong indications of its views as sufficiently to point

the course we must take; that is to say, it has laid down general rules upon general principles that must be accepted by this court as controlling in this instance.

In the Hannibal Bridge Case, already cited, 221 U. S. 205, 31 Sup. Ct. 603, 55 L. Ed. 699, the court distinctly ruled that requiring alterations in a bridge was not a taking of private property for public use. To the same effect had been its decisions in Union Bridge Co. v. United States, 204 U. S. 388, 27 Sup. Ct. 367, 51 L. Ed. 523. It likewise so held in Monongahela Bridge v. United States, 216 U. S. 177, 193, 194, 30 Sup. Ct. 356, 360 (54 L. Ed. 435). In the latter case the court said:

> "Although the Brownsville Bridge was originally constructed under the authority of the commonwealth of Pennsylvania, and may not, at the date of its erection, have been an illegal structure or an unreasonable obstruction to navigation, in the condition, at that time, of commerce and navigation on the Monongahela river, the bridge must be taken as having been constructed with knowledge, on the part of all, of the paramount power of Congress to regulate commerce among the states, and subject to the condition or possibility that Congress might, at some time after its construction, and for the protection or benefit of the public, exert its constitutional power to protect free navigation as it then was against unreasonable obstructions; that the mere silence of Congress and its failure to directly interfere and prevent the original construction of the bridge, under the authority of Pennsylvania, imposed no constitutional obligation on the United States to make compensation for subsequent changes or alterations, which the public good, in its judgment, required to be made."

In that case we find no reservation by the state of the right to amend the Bridge Company's charter. The charter of the Bridge Company, however, contained a proviso similar to that in defendant's charter. 216 U. S. 187, 30 Sup. Ct. 356, 54 L. Ed. 435.

In the case of Union Bridge Co. v. United States, 204 U. S. at page 400, 27 Sup. Ct. 367, 51 L. Ed. 523, and in Hannibal Bridge Co. Case, 221 U. S. at page 207, 31 Sup. Ct. 603, 55 L. Ed. 699, the court used language in substance the same as that we have extracted from 216 U. S. 193, 194, 30 Sup. Ct. 356, 54 L. Ed. 435. The lesson we take from this is that the general principle thus stated will ultimately be applied indiscriminately to cases where there was such reservation and to those where there was none, and that the question reserved in United States v. Baltimore & Ohio R. R. Co., 229 U. S. 254, 33 Sup. Ct. 850, 57 L. Ed. 1169, and in Bridge Co. v. United States, 105 U. S. 476, 26 L. Ed. 1143, will be so determined as definitely to support the paramount authority of Congress over the navigable waters of the United States, regardless of the apparent injustice and hardship which the courts may be compelled to inflict, in the absence of an exercise by Congress of its exclusive power to provide for compensation to owners of bridges situated as is the defendant in this case. Hard as this result may be, it cannot be harder than that of nullifying contracts of great importance between individuals, as was done in the Mottley Case and many others.

Clauses reserving power in Congress to amend a law granting authority to construct bridges over navigable waters seem first to have been noticed by the Supreme Court in Bridge Co. v. United States, 105

U. S. 470, 476, 26 L. Ed. 1143. Speaking of it as a "new provision," Chief Justice Waite said that its first appearance in congressional legislation on the subject of bridges is in the act of February 19, 1869 (15 Stat. 272, c. 37), passed at the same session of Congress as the act then under consideration. Of course such provisions make the task of the courts easier, but it does not necessarily follow that we must hold that one Congress can prevent a succeeding Congress from exercising its power to regulate commerce by any failure to make the reservation in acts like those of 1862, 1865, or 1899. This strikes us as being especially essential to the unfettered exercise by each succeeding Congress of the right to regulate commerce and to adjust legislation for that purpose to new exigencies and conditions as they arise. If this power does not exist almost without limitation, we have read in vain rulings like those in Louisville & Nashville R. R. Co. v. Mottley, 219 U. S., at page 480, 31 Sup. Ct. 265, at page 269 (55 L. Ed. 297, 34 L. R. A. [N. S.] 671), where it is said:

"There are certain propositions at the base of this inquiry which we need not discuss at large, because they have become thoroughly established in our constitutional jurisprudence. One is that the power granted to Congress to regulate commerce among the states and with foreign nations is complete in itself, and is unrestricted except by the limitations upon its authority to be found in the Constitution. Gibbons v. Ogden, 9 Wheat. 1 [6 L. Ed. 23]; Brown v. Maryland, 12 Wheat. 419 [6 L. Ed. 678]; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 229 [20 Sup. Ct. 96, 44 L. Ed. 136]; Scranton v. Wheeler, 179 U. S. 141, 162, 163 [21 Sup. Ct. 48, 45 L. Ed. 126]; C., B. & Q. R. R. Co. v. Drainage Com'rs, 200 U. S. 561 [26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175]; Union Bridge Co. v. United States, 204 U. S. 364, 400 [27 Sup. Ct. 367, 51 L. Ed. 523]; Atlantic Coast Line, etc., v. Riverside Mills, 219 U. S. 186, 202 [31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7]."

In the last of the cases quoted, on page 202 of 219 U. S., page 169 of 31 Sup. Ct. (55 L. Ed. 167, 31 L. R. A. [N. S.] 7), the court said:

"Undoubtedly the United States is a government of limited and delegated powers, but in respect of those powers which have been expressly delegated, the power to regulate commerce between the states being one of them, the power is absolute except as limited by other provisions of the Constitution itself."

We find no provision in the Constitution which can in any wise limit the operation of the commerce clause in this connection, unless it be that one in the fifth amendment which requires compensation to be made when private property is taken for public use. If such property be directly taken by the government in order to accomplish some purpose of its own in the regulation of commerce, such, for example, as the building of a dam or harbor, the fifth amendment would require compensation to be made to the owner.

We take it, however, that compensation in every case must depend upon the concurrence of two essential facts: First, there must be an actual taking of property by the government; and, second, such taking must be for public use. Each of these factors is essential, though we may assume that the government would not take property for other than public uses. The Supreme Court, as we have seen, has frequently held that requiring a bridge company to change its superstructure over a navigable river, so that it will not unreasonably ob-

struct navigation, is not a "taking" of property by the United States at all. The government in such cases takes no property and gets none. What it does, in this instance, and what it has done in others, is to require the Bridge Company to comply with the promise it made when it accepted its charter, namely, to so construct its bridge as not to obstruct navigation further than the laws of the United States made it legal. The obligation of this promise is, we think, continuous; and section 18 of the act of 1899 is as operative upon defendant's bridge as it is upon any other within its purview.

[6] Besides, the defendant's bridge, like others, must be considered as having been built in contemplation of the possibility of the exercise by Congress of its constitutional right and duty to require alterations when necessary for the regulation of commerce. But if the Bridge Company, either upon an implied contract to compensate it or upon any equitable ground, has any claim against the United States growing out of the acts of the Secretary of War, it can sue in the Court of Claims under section 145 of the Judicial Code, and always it can appeal to Congress. In order that we may not obstruct in any way those avenues to relief, we express no opinion as to whether or not any obligation upon the United States can be implied from the facts developed in this case. We think, indeed, that, whether there was a contract or not, section 18 must be enforced, leaving the question of compensation to be settled elsewhere—this court being powerless, though, if the court had been convinced that any sort of contract had been made which required compensation by the United States in case its powers were exercised under that section, it possibly was within the court's discretion to refuse an injunction until the equity arising out of that situation had been done by the government, thus leaving each party to its remedies at law.

It may further illustrate our views to add the suggestion that if proposed legislation, fairly considered, is a regulation of interstate or foreign commerce, the constitutional power of Congress to pass it cannot be affected by anything a previous Congress may have done short of express contract or pledge of public faith, though such previous action may greatly affect the question of the wisdom or the justice of the proposed measure in the estimation of those who are to vote upon it.

At the argument many cases were cited by one side or the other bearing upon illustrative contentions, but we think none of them should modify the conclusions we have reached. They do not, therefore, seem to require further notice, though they have not been overlooked.

After very careful consideration of the laws of the United States, the charter of the defendant, and the decisions of the Supreme Court in connection with the stipulated facts we have been forced to conclude:

First. That, although there was no reservation of the right to amend the acts of 1862 and 1865, it was, under the Constitution, within the power of Congress to enact section 18 of the act of 1899, and other similar legislation affecting bridges over navigable waters.

Second. That carrying into effect the order of the Secretary. of War will not constitute the taking of any of the property of the defendant by the government for public use.

Third. That, as Congress has made no provision for compensation to the bridge owner in such cases, this court has no power over the subject.

Fourth. That the charter of the defendant required it to construct its bridge so as not to obstruct navigation further than the laws of the United States and the decisions of the Supreme Court should hold to be legal, which, we think, means that the construction shall always meet those requirements; and

Fifth. That, whether or not there is a contract between plaintiff and defendant, the order of the Secretary of War is enforceable, leaving Congress, or the Court of Claims, to determine the question of compensation; they alone, in their respective spheres, having power over it.

We therefore hold that the order of the Secretary of War is a legal order as applied to defendant's bridge, and that the injunction prayed for should be granted. What should be the precise form of the order can be carefully considered, but it should provide that granting the injunction is without prejudice to the defendant's right to seek or sue for any compensation to which it may be entitled.